[622 NYS2d 699]

In the Matter of LORRAINE BACKAL (Admitted as LORRAINE BACKAL ISRAEL), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, February 16, 1995

**APPEARANCES OF COUNSEL**

*Barbara S. Gillers* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

*Michael Kennedy* for respondent.

**OPINION OF THE COURT**

Per Curiam.

This is a motion for interim suspension from practice pend-

ing consideration of charges of professional misconduct (22 NYCRR 603.4 [e]).

Respondent was admitted to the New York Bar at the Second Judicial Department in 1953, as Lorraine Backal Israel, and thereafter practiced law in New York City, specializing in trusts and estates and criminal defense. In 1989 she ascended the Civil Court Bench in the Bronx, and was later designated an Acting Justice of the Supreme Court in that County, positions from which she resigned in November 1994, ostensibly to return to private practice on Long Island. At all times relevant to these proceedings, respondent worked and maintained a residence within the First Judicial Department.

In September 1994 the United States Attorney for the Southern District of New York informed petitioner of an investigation her office had conducted in 1990, which implicated respondent in narcotics trafficking and money laundering. Respondent's alleged involvement in these activities was through her relationship with one Selwyn Wilson, a young man whom her firm had represented in a criminal matter in the mid-1980's. Charged with assault and robbery, Wilson had pleaded guilty to reduced charges and received a sentence of probation, on condition that he maintain lawful employment. Respondent developed a "warm familial relationship" with Wilson (counsel describes him as respondent's "surrogate son"), employing him briefly as an office clerk and then as her personal assistant and driver. According to Wilson, he escorted respondent in the latter capacity to meetings and social functions, and on those occasions he often spent the night at her homes in the Bronx or in Brookville, Long Island.

In 1990, Wilson cooperated for a time with Federal authorities in providing information about his unlawful activities, including cocaine transactions with a known narcotics dealer, and a $700,000 money-laundering operation on behalf of certain individuals from Rhode Island. Wilson told the agents that despite respondent's awareness of these activities, she allowed him to use her automobile (bearing Civil Court Judge license plates) and her homes as secure places to store the cocaine, in exchange for cash payments. Wilson was aware that respondent was financially strapped, following an expensive campaign for the Civil Court and relinquishment of her lucrative private practice. On several occasions between November 8 and December 5, 1990, Wilson secretly recorded his telephone conversations and personal meetings with respondent, during which the two discussed Wilson's various crimi-

nal enterprises, including a recent importation of 300 kilos of cocaine, the concealment of $700,000 in laundered narcotics proceeds, and the anticipated receipt of another $3 million from the Rhode Island connection in furtherance of the money-laundering scheme. Aware that the FBI was reportedly seeking to question Wilson, respondent suggested that the agency's inquiry might only be concerned with a bitterly contested estate matter in which Wilson had purportedly submitted a perjurious affidavit in support of a motion, backed by respondent, to challenge a coconservator. Respondent counseled Wilson to retain a low-profile law firm, so as not to arouse suspicion of his involvement in other criminal matters.

On November 29, Wilson handed respondent an envelope with $10,000 in cash for safekeeping. Six days later, the discussion turned to where Wilson could conceal the $700,000. Respondent counseled against putting it in a safe deposit box, because every bank in the neighborhood would be checked by investigators. "[B]ury[ing] it in [Wilson's mother's] backyard" was out of the question because "ya mother's house is hot." (Wilson and his mother had just pleaded guilty, in separate Federal prosecutions, to participating in a scheme to deposit stolen checks.) Respondent also suggested the possibility of concealing it at the home of another confederate, identified as "the Reverend", which had been used as a hiding place in the past. Respondent acknowledged that that location was still "safe", at least "[u]ntil they * * * start ripping paneling, which they are capable of doing." (Respondent reminded Wilson that that was the type of hiding place used in the "French connection"—a case where she had represented one of the defendants—but cautioned that the danger in "burying the stuff in the wall [is] that the rats may eat the money. * * * you gotta put it in tin.") Respondent offered to hold the $700,000, which Wilson would pack in a Samsonite suitcase, in her home for safekeeping. Expressing "paranoi[a]" that one of Wilson's confederates might get "busted" or "rat[ted] * * * out", respondent urged him to "be careful with that money. I hate it even in your car."

Shortly after this latest meeting, which took place on December 5, 1990, Wilson ceased cooperating with the FBI; the United States Attorney's office believes that Wilson thereupon revealed to respondent that he had surreptitiously recorded their conversations for the brief period in question. Wilson was arrested in February 1991, and later pleaded guilty to Federal felony charges of conspiracy to launder funds, conspir-

acy to commit bank fraud, and wire fraud. Released on bail pending sentence, he has been a fugitive at large ever since.

Confronted with the tape recordings, respondent acknowledged the conversations but characterized them simply as errors in judgment. On November 29, eight days after respondent's resignation from the Bench, petitioner opened its investigation based upon the information received from the United States Attorney. Petitioner's complaint charged possible engagement in conduct involving dishonesty, fraud, deceit or misrepresentation (Code of Professional Responsibility DR 1-102 [A] [4]; 22 NYCRR 1200.3 [a] [4]); conduct prejudicial to the administration of justice (DR 1-102 [A] [5]; 22 NYCRR 1200.3 [a] [5]); and other conduct adversely reflecting on respondent's fitness to practice law (DR 1-102 [A] [8]; 22 NYCRR 1200.3 [a] [8]).

An attorney who is the subject of charges of professional misconduct may be suspended from practice pending consideration of those charges, upon an interim finding that the attorney is guilty of such misconduct "immediately threatening the public interest" (22 NYCRR 603.4 [e] [1]). Such a finding can be based upon "uncontested evidence of professional misconduct" (22 NYCRR 603.4 [e] [1] [iii]). Respondent has never disputed that the recorded conversations took place. Instead, she suggests that she is the target of a vendetta by Federal authorities because of her refusal to cooperate with the Government in its investigation into illegal activities and corruption among politicians and other Judges.

Respondent denies that her participation in these conversations constitutes misconduct. She portrays them as private and privileged communications, made within the sanctity of her own home, with a "de facto member of her family", a troubled young man then gripped in the manipulative clutches of Federal authorities. Such "pure speech", she argues, should not be the sole basis for interrupting her livelihood.

The transcripts of respondent's conversations speak for themselves, and our action today is based solely on those words. Aside from the fact that there is no recognized privilege for counseling an adult "child" (even in the loosest application of the word), respondent's words were anything but acceptable "motherly" advice. The brief portions excerpted above were not taken out of context. They evince behavior which, otherwise unexplained, constitutes professional miscon-

duct warranting disqualification of any attorney from practicing before the Bar of this State.

We note that respondent has withdrawn her jurisdictional objection, as well as her cross motion challenging petitioner's subpoena duces tecum. Accordingly, the motion is granted and respondent is suspended from the practice of law pending consideration of these charges; respondent is further directed to comply with petitioner's subpoena, and otherwise to cooperate in its investigation.

WALLACH, J. P., KUPFERMAN, ROSS, NARDELLI and TOM, JJ., concur.

Application granted, and respondent is suspended from practice as an attorney and counselor-at-law in the State of New York forthwith, and until the further order of this Court, and she is directed to show cause before petitioner's Hearing Panel why a final order of suspension or other appropriate disciplinary measure should not be entered against her, all as indicated. Respondent is directed to comply with petitioner's subpoena, and otherwise to cooperate in its investigation. Respondent's cross motion is withdrawn.